**[J-91-2020] [MO: Todd, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | |
|---|---|
| IN RE: P.G.F | : No. 7 WAP 2020 |
| | : |
| | : |
| | : Appeal from the Order of the |
| APPEAL OF: K.F., NATURAL FATHER | : Superior Court entered January 27, |
| | : 2020 at No. 1284 WDA 2019 |
| | : affirming the Order of the Court of |
| | : Common Pleas of Bedford County |
| | : entered August 7, 2019 at No. 3 AD |
| | : 2018. |
| | : |
| | : ARGUED: October 22, 2020 |

**DISSENTING OPINION**

**JUSTICE WECHT**                                          **DECIDED: MARCH 25, 2021**

In Section 2313 of the Adoption Act, the General Assembly of Pennsylvania mandated that "[t]he court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents." 23 Pa.C.S. § 2313(a). As the Majority recognizes, the General Assembly made the policy decision "that children be given a voice in termination proceedings." Maj. Op. at 9. This Court has made it clear that the plain language of the statute demands "a lawyer who represents the child's legal interest and who is directed by the child." *In re: Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017). Because today's Majority permits something less than the client-directed counsel that the statute mandates, I respectfully dissent.

The facts of this case are unusual. First, unlike most termination of parental rights ("TPR") cases, this case did not begin as a dependency proceeding. At the time that the TPR petition was filed, the appointed attorney/guardian *ad litem* ("GAL"), Carol Ann Rose,

Esquire, did not have a long-standing relationship with P.G.F. ("Child"). In fact, Attorney Rose had not interacted with Child at all before her dual appointment as counsel and GAL. Second, no one contends that K.F. ("Father") had a parental relationship with Child when the TPR process began. Child did have a relationship with the paternal grandmother, who had exercised some of Father's custody time. But it is clear that no one informed Child about his relationship with Father or about how a TPR order would affect that relationship.[1] Further, when the Superior Court remanded the case on Father's first appeal, it noted that Attorney Rose had neither articulated Child's legal interests nor stated that Child was developmentally unable to express his legal interests. *In re P.G.F.*, 1464 WDA 2018, 2019 WL 1199986, at *3, *4 (Pa. Super. Mar. 12, 2019) (unpublished memorandum).

Following the remand, the trial court re-affirmed the TPR order. Father again appealed. This time, a majority of the Superior Court panel affirmed, holding that the record supported the trial court's determination that there was no conflict between Child's

---

[1] The effect of the TPR on the parental grandmother's custody is unsettled. This Court has permitted grandparents to intervene "as any other individual or individuals who seek to adopt a child" in an adoption proceeding after the biological parents' consent to adoption was accepted and their parental rights terminated. *See In re Adoption of Hess*, 608 A.2d 10, 15 (Pa. 1992). However, the Court has not directly addressed the extent to which a grandparent as to whose grandchild parental rights were terminated may continue to seek or exercise custody rights, nor has the Superior Court conclusively ruled upon the issue. *Compare Rigler v. Treen*, 660 A.2d 111, 113 (Pa. Super. 1995) (citing the statute then-equivalent to 23 Pa.C.S. § 5326 that terminates a grandparent's rights to seek custody when a grandchild is adopted except when the adoption is by a stepparent or grandparent and holding that "[s]ince the grandparents' rights survive such an adoption, it follows that the termination of the biological parent's rights alone does not cut off the visitation rights of the biological grandparents.") *with In re M.A.H.*, 2019 WL 1057357, at *7 (Pa. Super. Mar. 5, 2019) (unpublished memorandum) (holding that Section 5326 does not preserve a grandparent's "legal status as a consanguineous relation following the entry of an adoption decree" and "[a]t most, § 5326 conveys . . . the ability to seek standing to pursue a custody claim."). In this case, Mother testified that she would continue to permit the paternal grandmother to see Child even if Father's parental rights were terminated. Notes of Testimony ("N.T."), 7/31/2018, at 43-44.

best and legal interests such that Attorney Rose's dual appointment was permissible and that Attorney Rose adequately had represented Child's interests despite withholding information from Child. *In re P.G.F*, 2020 WL 579038, at *4 (Pa. Super. Jan. 27, 2020) (unpublished memorandum).

Judge Bowes dissented. In her view, Attorney Rose had not fulfilled her duty to represent Child's legal interests. *Id.* at *6-*10. Attorney Rose's discussion with Child centered upon Child's preferences for physical custody, which Judge Bowes observed was irrelevant to the issue of TPR and adoption, particularly inasmuch as T.G.H.'s ("Mother") continuing custody of Child was not at issue.[2] *Id.* at *7. Judge Bowes also noted that the record indicated Child's awareness of Father, which developed during Child's time with the paternal grandmother. *Id.* at *8. At the TPR hearing, Mother's testimony established that Child recognized Father as a friend of paternal grandmother and that Child referred to Father by his first name.[3] Therefore, while Child did not accurately understand his biological relationship to Father, the conclusion that Child did not know Father was not fully supported by the record. *Id.* at *7-*8.

Judge Bowes also opined that the record demonstrated that Child was able to express his legal interests. *Id.* at *8-*9. Thus, when she failed to provide Child with the information necessary to make an informed decision, Attorney Rose failed to comply with

---

[2]    *See* Letter from Attorney Rose, 6/11/2019 at 1-2 (unpaginated). Attorney Rose reported that she spoke with Child for twenty minutes, that he was one-month shy of his seventh birthday at the time, that the name Child associated with "daddy" was the stepfather's name, that he wanted to live with Mother and the stepfather, that he did not know anyone with Father's name, and that he wanted to be adopted yet did not know what adoption meant.

[3]    *See* N.T., 7/31/2018, at 26 (Mother testifying that, when Child would return from the paternal grandmother's house, Mother would ask who was there and Child would sometimes include Father's first name in the list of people); *see also id.* at 31-32 (Mother testifying that Child refers to Father by Father's first name and that Child believed Father to be his paternal grandmother's friend).

the statutory mandate to represent Child's legal interests. *Id.* at *10. Judge Bowes stated that, "it is [A]ttorney Rose's principal obligation as legal counsel to ascertain [Child's] legal interest and promote it. Thus, at a minimum, she must provide [Child] with the necessary facts to enable him to articulate any preference he has about the outcome of the termination proceedings." *Id.* at *9. Despite the difficulty inherent in informing Child of the reality of his family situation, Judge Bowes concluded that the statutory mandate rendered this task necessary and that Attorney Rose had both the authority and the obligation to do so in ascertaining and advancing Child's legal interests. *Id.* at *10.

The Majority chooses to embrace the Superior Court majority's view. From our recent decision in *In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020), the Majority gleans that a child's attorney/GAL "must, at a minimum, attempt to ascertain the child's preference and advocate on the child's behalf." Maj. Op. at 13. However, because children necessarily possess varying levels of ability to understand and communicate, "ascertaining a child's preferred outcome may involve various circumstance-appropriate strategies." *Id.* Because Child was unaware of his family situation, and because he "could be emotionally harmed if informed of such facts or closely interrogated regarding his preference," the Majority concludes that Attorney Rose was required to use "caution and reflection" and that courts should afford "significant deference . . . to counsel's approach in discerning a child's preference and the child's articulation thereof." *Id.* at 14.

The Majority finds the Superior Court's decision in *In re: Adoption of C.J.A.*, 204 A.3d 497 (Pa. Super. 2019), to be consistent with this approach. *Id.* at 15. In that case, a child did not know his biological father. *In re: C.J.A.*, 204 A.3d at 502. For that reason, the appointed attorney stated that she was unable to explain the effect of the TPR to the child. The Superior Court held that the attorney had fulfilled the requirements of Section

2313 under the circumstances and that she had discharged her duty of representing the child's legal interests in light of the child's age, maturity, and emotional condition.

But *C.J.A.* is distinguishable on two important points. First, the attorney in *C.J.A.* reported to the court that she could not ascertain the child's preferred outcome given the child's age and development.[4] Here, Attorney Rose made no such claim. Instead, despite Child's unawareness of the true nature of the proceedings, Attorney Rose informed the court of what she perceived to be Child's legal interest. Second, in *C.J.A.*, the trial court did not terminate the father's parental rights. *Id.* at 498. Therefore, even if the child was incapable of processing the information about who the father was at the time of the TPR hearing, further litigation was contemplated because the father had filed for custody before the TPR was filed. *Id.* at 499. Thus, even if the attorney and the trial court were wrong about the child's ability to understand the situation, the child would likely have an opportunity to express his wishes at a later date. Stated otherwise, the parental relationship was not permanently ended with the child being permanently deprived of the opportunity to express a preferred outcome.

My views align substantially with those advanced by Judge Bowes in her persuasive dissent. No one disputes that Attorney Rose was put in a difficult position when Child's family chose not to tell him the truth about his family situation. But the evidence that Attorney Rose chose to present regarding Child's legal interest largely was irrelevant to the issue of the TPR and adoption. While a child's preference about custody

---

[4] *See In re C.J.A.*, 204 A.3d at 502 (quoting the attorney's brief to the court explaining that "[D]ue to the age and maturity of [Child] along with the fact that he did not know [Father] was his biological father, the undersigned, as legal counsel, was unable to explain the termination of parental rights proceeding and/or discuss the potential adoption by [Fiancé]. . . . As a result, the undersigned was unable to set forth a position on the record since the undersigned was only appointed as legal counsel and not as a [GAL] and it could not be sufficiently ascertained as to what [Child's] position would be regarding the termination of parental rights.").

could be relevant to TPR (particularly if the child wants to live with the parent whose rights are subject to termination), that will not always be the case. The question that TPR proceedings ask is whether the child will have any ongoing connection with the parent and the parent's extended family. That is usually unrelated to where the child wants to live. This is particularly true here insofar as Father has not sought custody.

I do not suggest that a child in a similar situation would always have to be told the entire unvarnished truth or that the appointed attorney must be the one to inform the child. But the gravity of terminating a child's relationship with a parent and with that parent's family is difficult to overstate. Our General Assembly has determined that a child whose interests are caught up in such an unfortunate proceeding must have a voice in that process through client-directed counsel.[5] Without knowing who Father is and without knowing the consequences of the TPR, Child cannot adequately form a legal preference. Nor is this issue an abstract one. For example, Child here has a relationship with his paternal grandmother, and he may strongly favor her continuing to exercise custody rights that might be challenged post-TPR.[6] Attorney Rose, upon learning such a fact, in turn would have an obligation to translate this preference into a reason why Child might oppose termination. A child may not wish to live with a parent who is subject to a TPR petition, but may not wish to cut off all avenues of contact forever. A child may decide that, if an absentee parent did not make the effort to participate in the child's life, the child

---

[5]     *In re L.B.M.*, 161 A.3d at 180 ("[W]hen a child's relationship with his or her birth family could be severed permanently and against the wishes of the parents, the legislature made the policy judgment, as is evidenced from the plain, unambiguous language of the statute, that a lawyer who represents the child's legal interests, and who is directed by the child, is a necessity.").

[6]     For example, at the remand hearing, Attorney Rose reported that Mother had severely curtailed the paternal grandmother's custody, which had upset Child. N.T., 8/7/2019, at 17-18.

wishes to have parental rights terminated in order to facilitate adoption by a step-parent who is in fact present. But, in this case, we will never know Child's preference. Even though Attorney Rose deemed Child to be capable of expressing his own legal interest,[7] she did not give Child the facts necessary to make an informed assessment of his situation, an assessment that could have been aided by the adult assistance of Attorney Rose and perhaps others. To permit an attorney to withhold vital information from a child in a contested TPR defeats and destroys that child's voice and role in the process. And it utterly confounds the General Assembly's clear intention.

While we would not countenance an attorney withholding critical information from a client in other settings,[8] I acknowledge that children are different. It may not be appropriate to inform a child of potentially damaging information in all cases. However, legal counsel for children should be encouraged to begin from a presumption of transparency, departing only when extraordinary circumstances strongly militate for abandonment of that presumption. The simple fact is that the child's counsel cannot discharge his or her duty to zealously represent the child's legal interest if the child lacks the information necessary to make informed decisions about his or her own interests.

If a child's attorney discovers that the child is without information that would be vital to forming a preference, the attorney first must assess whether it is possible to provide that child with a fuller account without harming the child's emotional and mental well-being. Some cases will be easy. A two-year-old clearly does not need to be informed

---

[7]     N.T., 8/7/2019, at 13 (Attorney Rose testifying that Child "was able to express" his preferred outcome).

[8]     Pennsylvania Rule of Professional Conduct 1.4(b) requires that a "lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation," but recognizes that particular circumstance may justify "delaying transmission of information." *Id.* cmt ("Withholding Information").

that there is another father of whom the child is not aware, while a fourteen-year-old, in most cases, would be able to understand and process that information.[9] At a minimum, the attorney should inform the court that the child lacks important information and should explain whether or not (and why) the attorney intends to share that information with the child so that the court has the proper context within which to assess counsel's and the child's representations of the child's preference. When uncertain whether or how to inform the child, the attorney should seek a court-appointed evaluator to determine whether the child is capable of learning and processing the information in a developmentally appropriate manner. If the evaluator determines that the information would be too damaging, then the court can choose to treat the child as one unable to express a preferred outcome, while the attorney can proceed with whatever information he or she can glean about the child's legal interest directly. If the evaluator determines that the child is developmentally capable of learning the information, the evaluator can provide guidance on how best to proceed.

The Majority's decision to defer more or less categorically to the attorney's determination about when information should be withheld from the child client undermines the very nature of the statutorily mandated representation. Today's disposition allows counsel to shape, or even distort, the information with which the child must determine the very preference that it is counsel's duty to advance. The General Assembly has provided a child in a contested TPR with the right to an attorney. The rendering of informed advice

---

[9] *Amici* note that "many advocates consider that children as young as seven can appropriately and responsibly maintain a traditional attorney-client relationship and will benefit from one." Brief of Juvenile Law Center, Community Legal Services Inc., and 16 National, State, and Local Organizations and Individuals Who Are Experts in the Fields of Child Welfare, Public Policy, and Law at 5. Our Court has endorsed the view that a child as young as five or six may be able to express "opinions which are entitled to weight in legal proceedings concerning their custody." *In re T.S.*, 192 A.3d 1080, 1089 n.17 (Pa. 2018).

and the pursuit of vigorous advocacy lie at the heart of the attorney-client relationship, the nature of which should not fundamentally change with a client of tender years. And to protect a child who has little or no ability to look after his or her own legal rights,[10] a court also must have the information required to be satisfied that the child's attorney does not suffer from any conflicts and has informed the child of all necessary information to make informed choices.

It bears repeating that counsel has an obligation to keep a child-client as informed as is practicable in order to ensure an accurate assessment of the child's preferences. That is not to say that counsel should simply provide information to a young child without regard for the risk of psychological injury or confusion. To the contrary, it equally is counsel's duty to address gaps in the child's relevant knowledge with care and to enlist specialists and caregivers as circumstances require. I differ with the Majority inasmuch as I do not believe that courts should defer blindly to counsel's determinations, but, instead, must play a role in ensuring that counsel has fulfilled his or her statutory and ethical duties. As I have said before, whatever challenges such a demanding protocol presents pale in comparison to the enormous and permanent consequences of terminating parental rights:

> I recognize that courts in all contexts must depend upon the good faith and integrity of counsel. But where the potential injury is so grave and so thoroughly irreversible, and where the child whose best interests are paramount is so vulnerable, courts should do everything in their power to maximize the likelihood of a fair and just result.

---

[10] *See In re. T.S.*, 192 A.3d at 1087 ("The statutory right under Section 2313(a) belongs to the child, not the parent. *Accord In re E.F.H.*, 751 A.2d 1186, 1189 (Pa. Super. 2000). There was no attorney representing solely the children's legal interests who could have raised their rights in the trial court, and the children plainly could not have done so themselves.").

*In re: K.M.G.*, 240 A.3d at 1253 (Wecht, J., concurring and dissenting). Our courts must exercise their duty to prioritize the child's best interests by ensuring that the child's attorney is discharging his or her duty to the child.

To be sure, involving an evaluator in the process will require time and resources, and could delay permanency for a child. But while permanency is an important consideration, so is the child's voice in this critical process. Our General Assembly made this clear when it enacted Section 2313. The child's voice and human agency should not be sacrificed willy-nilly on the altar of a speedy process.